## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Case No. 1:18-cv-11826-NMG

**STEVEN SANDOE,** individually and on
behalf of all others similarly situated,

       *Plaintiff,*

*v.*

**BOSTON SCIENTIFIC CORPORATION,**
a Massachusetts corporation,

       *Defendant.*

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
## AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Federal Rule 23(b)(3), Plaintiff Steven Sandoe moves to certify classes with respect to two claims against Defendant Boston Scientific Corporation for violations of the Telephone Consumer Protection Act, arising from prerecorded voice calls Boston Scientific made to "wrong numbers" as part of a unified calling campaign to promote marketing events sponsored by Boston Scientific and hosted by various physicians across the country.

Class certification is warranted because the relevant facts and legal issues corresponding to Plaintiff Sandoe's TCPA claims against Boston Scientific are identical to those corresponding to the other wrong number call recipients of Boston Scientific's unsolicited, pre-recorded voice calls, and are subject to classwide proofs. Boston Scientific collected the phone numbers in the same way – i.e., from physicians that provided lists of their patients' names and phone numbers – and then made substantively similar prerecorded voice calls to all of them without taking any steps to verify that the calls were being made to the intended recipients and not to consumers like Plaintiff Sandoe that had been reassigned some of the phone numbers to which calls were made.

Under these circumstances, the requirements for certification under Federal Rule 23 are satisfied.

I.      FACTS

   A.  **Boston Scientific Manufactures, Markets, and Sells Medical Devices**

Boston Scientific is a medical device manufacturer. *See* Complaint [D.E. 1]. Boston Scientific's medical device offerings include implantable technologies for chronic pain, including spinal cord stimulation products. *Id*. The spinal cord stimulation products are marketed and sold by Boston Scientific's neuromodulation division. Boston Scientific's neuromodulation division works to increase sales of spinal cord stimulator products by directly

marketing the products to consumers under the guise of *patient education*.  Fetters[1] 20:19-22:1, 23:5-24:2, 28:23-29:19; Fetters 99:2-101:17 & Ex. 2 (Business Associate Agreement for Focus on Diagnosis event, stating: "███████████████████████████████████████████ ███████████████████████████████████████████████████████.");  Fetters 112:11-114:10 & Ex. 5 (Boston Scientific booklet accompanying DVD included in Welcome Kits for Focus on Diagnosis events); *see also* Van Gent[2] 17:11-18 (██████████████████ ██████████████████████████████████████████).

### B.  Boston Scientific's Direct to Consumer Marketing

As relevant to this case, one of the primary means that Boston Scientific uses to directly market its spinal cord stimulator products to consumers is *educational* events it refers to as Focus on Diagnosis events.  Fetters 29:21-30:8, 31:25-32:5, 33:9-34:9, 37:9-16; Van Gent 21:17-20.  Each Focus on Diagnosis event is sponsored, supported, and attended by Boston Scientific and hosted by a physician that Boston Scientific "work[s] with" who "speaks to an audience … about

---

[1] Citations to "Fetters" are to excerpts of Benjamin J. Fetters's deposition attached as Exhibit 1. Mr. Fetters has worked in Boston Scientific's neuromodulation division since May 2011.  Fetters 5:13-15; *see also* Boston Scientific's Initial Disclosures (attached as Exhibit 2) at (i) (identifying by name Mr. Fetters only).  For the last 5 years, Mr. Fetters has been one of only five Regional Marketing Managers responsible for the marketing and sale of Boston Scientific spinal cord stimulator products.  Fetters 5:16-22, 24:9-24, 27:12-22.  Prior to that, he was an Account Manager and Territory Manager similarly devoted to the marketing and sale of spinal cord stimulator products.  Fetters 5:23-6:25, 14:22-15:1, 16:20-18:16.

[2] Citations to "Van Gent" are to excerpts of Stan Van Gent's deposition attached as Exhibit 3. Mr. Van Gent was the Director of Marketing for Boston Scientific's neuromodulator division from 2011 to 2017.  Van Gent 5:13-6:5; *see also* Van Gent Ex. 11 (Boston Scientific's answers to interrogatories verified by Mr. Van Gent).  As Director of Marketing, Mr. Van Gent managed the regional manager marketing team that included Mr. Fetters.  Van Gent 13:21-14:1.  Mr. Van Gent and Mr. Fetters were specifically involved in Boston Scientific's decision to begin making prerecorded voice calls on behalf of physicians hosting Focus on Diagnosis events.  Van Gent 30:20-32:16.

all of the therapies that they offer around managing chronic pain," including Boston Scientific's spinal cord stimulator products.  Fetters 31:25-32:5, 37:9-16, 38:25-39:20; Fetters 86:22-88:7 & Ex. 1 (Focus on Diagnosis brochure for physicians hosting events); Fetters Ex. 3 (Physician's Facebook event page for Focus on Diagnosis event, stating:  "The event is sponsored by Boston Scientific …."); Fetters 114:14-116:1 & Ex. 6 (slide deck for presentation by physician at Focus on Diagnosis events); Van Gent 35:1-16; Boston Scientific's Answers to Interrogatories, attached as Exhibit 4, at no. 8.  The way it's intended to work is that "[t]he physician invites their own patients to the event, for a Focus on Diagnosis event."  Fetters 31:1-4, 47:23-48:14, 61:5-20.

### C. **Boston Scientific's Prerecorded Voice Message Calls to Consumers**

To that end, between 2014 and 2018, Boston Scientific provided event planning support for Focus on Diagnosis events including, among other things, ███████████████████ ████████████████████████████████████████████████████████████ ██████████  Fetters 44:16-20, 45:14-46:1, 60:10-11.  Notably, Boston Scientific stopped transmitting invitations using prerecorded voice messages for Focus on Diagnosis events "around the beginning of [its] … awareness of this lawsuit."  Fetters 45:1-9.

But prior to this lawsuit, between 2014 and 2018, Boston Scientific contracted with and paid vendors ████████ and █████████████████ to transmit the prerecorded voice message invitations.  Fetters 64:16-20; Fetters 120:8-121:5, 127:2-9 & Ex. 7 (Master Services Agreement between Boston Scientific and ████████████); Fetters 132:19-134:7 & Ex. 8 (Master Services Agreement between Boston Scientific and ████████████████); Fetters 137:14-138:24 & Ex. 9 (flyer for physicians explaining prerecorded voice message invitation service for Focus on Diagnosis events).

The prerecorded messages that were transmitted by Boston Scientific were recorded by

█████████████████████████████████████████████████████████████

███████████.   Fetters 65:2-16; *see* Partial list of Focus on Diagnosis events between February

2018 and August 2018 for which prerecorded voice message invitations were transmitted

produced by Boston Scientific, attached as Exhibit 5.  ███████████████████████

████████████████████████████████████████████████████

Fetters 65:17-67:16; Fetters 140:2-7, 142:1-19 & Ex. 10.  There were also written instructions

prepared in connection with the script that, ████████████████████████ specifically

stated:  "**Please no mention of [Boston Scientific] in the message**."  Van Gent 44:21-46:25;

Fetters Ex. 10; Fetters Ex. 11 (emphasis in original).  ██████████████████████

██████████████████████████████████████████████████

█████████████████████████████████

████████████   Fetters 65:17-67:16; Fetters 140:2-7, 142:1-21 & Ex. 10; *see, e.g.,* examples of call

recordings, attached as Exhibit 6.

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

Fetters 68:14-22, 94:22-95:4; Boston Scientific's Answers to Interrogatories at no. 1.  ██████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████   Fetters 68:23-69:7, 70:4-23, 74:21-75:1, 146:17-148:15; Van Gent 26:9-29:1;

Boston Scientific's Answers to Interrogatories at no. 4.

Notwithstanding, Boston Scientific or its agent transmitted between 1 and 3 prerecorded voice messages to each of the phone numbers supplied by the physicians, regardless of whether the phone numbers were still associated with those physicians' patients.  Fetters 76:18-77:3; *see* Exhibit 5 (reflecting between 1 and 3 calls per event in the "Date(s) Calls Were Placed" column). In total, prerecorded voice message invitations for Focus on Diagnosis events were transmitted by Boston Scientific to 265,948 unique phone numbers.  *See* Email from Boston Scientific's counsel transmitting discovery responses, attached as Exhibit 7, and stating:  "[T]here were 265,948 unique telephone numbers called by BSC since 8/26/2014 with prerecorded invitations to educational seminars."

   D.  **Boston Scientific's Prerecorded Voice Message Calls to Wrong Numbers**

Included in these phone numbers was phone number 817-901-xxxx which, at the time, was assigned to Plaintiff Sandoe for his personal use and registered on the national Do Not Call registry.  Plaintiff's Amended Answers to Interrogatory Nos. 1 & 2, attached as Exhibit 8, at nos. 1-2; Plaintiff's Answers to Interrogatories, attached as Exhibit 9, at no. 3; *see* T-Mobile records, attached as Exhibit 10, identifying Mr. Sandoe as subscriber.  Mr. Sandoe received two prerecorded voice message invitations that were not intended for or otherwise relevant to him. Plaintiff's Amended Answers to Interrogatory Nos. 1 & 2 at nos. 1-2; Fetters 93:16-94:1; Van Gent 42:8-43:22; Boston Scientific's Answers to Interrogatories at nos. 3, 10 (explaining that the calls were relevant to the health care of the intended recipients only); *see* Call Detail Report for calls to Mr. Sandoe's phone number produced by Boston Scientific, attached as Exhibit 11. Those calls were instead intended for a patient of one of the physicians hosting a Focus on Diagnosis event sponsored by Boston Scientific who was previously assigned Mr. Sandoe's phone number.  Boston Scientific's Answers to Interrogatories at no. 3.

5

Based on these unsolicited prerecorded voice message invitation calls regarding Focus on Diagnosis events from Boston Scientific, Plaintiff now seeks to certify two classes of similarly situated consumers who were not the intended recipients of prerecorded voice message invitation calls and who, like Mr. Sandoe, did not consent to Boston Scientific's calls and were "called in error" in violation of the TCPA.  *See* Boston Scientific's Answers to Interrogatories at no. 9-10 (explaining that consent was obtained only to make calls to the intended recipients of the calls – i.e., physicians' patients – and not to wrong numbers); *see also* Van Gent 36:24-37:2 ("Q: Have you ever called somebody at a phone number that you thought was theirs and gotten someone that had been reassigned their phone number? // A: Yes.").

**E.  Plaintiff's Expert's Proposed Methodology for Identifying Wrong Number Calls**

Plaintiff proffers expert Anya Verkhovskaya to testify regarding the identity of wrong number call recipients for both of Plaintiff's proposed classes based on Boston Scientific call records and historic third party data for the dates on which Boston Scientific made prerecorded voice calls.  As further explained in her expert report, attached as Exhibit 12, to identify wrong number call recipients for both classes Ms. Verkhovskaya proposes the following multi-step process, which she applied to identify wrong number class members called in connection with 5 Focus on Diagnosis events for which Boston Scientific produced call records to demonstrate her proposed methodology.[3]

The first step of Ms. Verkhovskaya's methodology is to provide the list of telephone numbers to TransUnion for TransUnion to use its proprietary algorithm to link names and addresses to each phone number, and specify the timeframe during which any user was

---

[3] Because Plaintiff relies on this expert testimony in seeking class certification, an analysis of its admissibility under *Daubert* is included at § V, below.

associated with any given phone number.  Using this reverse-append process for the 5 Focus on
Diagnosis events, Ms. Verkhovskaya identified the historical names and addresses of
subscriber/users for 8,679 of the 9,087 unique phone numbers called by Boston Scientific (95.5%
of the phone numbers).  *Id*. at ¶ 47.  Ms. Verkhovskaya confirmed her methodology by
completing a similar analysis of Plaintiff Sandoe's phone number, which resulted in
identification of Mr. Sandoe as the user on the dates on which Boston Scientific called him.

Next, Ms. Verkhovskaya proposes to compare the identified historical names and
addresses from the reverse lookup with Boston Scientific's call records identifying the name of
the intended call recipients to identify the wrong numbers.  In order to process the data most
conservatively as part of the initial processing, Ms. Verkhovskaya's proposed methodology
relies on comparing the surnames in both sets of data to identify whether the call was made to a
"wrong number."  Applying this step of the methodology to the data from the 5 Focus on
Diagnosis events, Ms. Verkhovskaya identified a total of 2,808 phone numbers for which the
user was not listed in Boston Scientific's records as the intended recipient of the call.
Accordingly, 31% of the telephone numbers from the Source Data were identified as having
received a wrong number call. This wrong number rate is consistent with Ms. Verkhovskaya's
experience with reassigned numbers and wrong number cases. *Id*. at ¶¶ 42-51.

Ms. Verkhovskaya then proposes to analyze the wrong numbers to determine whether
those phone numbers were associated with cell phones or landlines at the time of the calls.  *Id*. at
¶¶ 52-60.  To do this analysis, Ms. Verkhovskaya uses Data Processor, IMS to cross-reference
the relevant phone numbers against the Wireless Block Identifier® File, Wireless Ported Number
File (landline-to-cellular, and cellular-to-landline ported telephone numbers), and audit files (the
"IMS Files").  Applying this step to the 5 Focus on Diagnosis events, Ms. Verkhovskaya

identified 2,000 unique cell phone numbers and 808 non-cell phone numbers in the data set. *Id.* at ¶ 59.

Ms. Verkhovskaya next proposes to process the "wrong number" phone numbers through the LexisNexis business-identification query. Applying this step to the Focus on Diagnosis data set, Ms. Verkhovskaya found that 12 of the non-cell phone numbers were identified as business numbers at the relevant time. Accordingly, Ms. Verkhovskaya determined that in the data set there were 2,796 consumers with "wrong number" cell phone and residential numbers that would be included in the Prerecorded No Consent Class defined below. *Id.* at ¶ 60.

To further determine which members of the Prerecorded No Consent Class are also members of Do Not Call Registry Class Ms. Verkhovskaya proposes to identify which of the identified "wrong number" phone numbers called by the Boston Scientific were on the national Do Not Call registry at the time of the calls. Exhibit 12 at ¶¶ 61-70. Specifically, Ms. Verkhovskaya proposes to analyze the date each phone number was added to the Do Not Call registry, if applicable, utilizing data obtained from either Nexxa or CCC, which provide an output file that includes whether the number is on the registry and, if so, the date on which it was registered. Ms. Verkhovskaya then proposes to review the output to identify all wrong numbers that were registered on the Do Not Call registry at the time of the calls. For the Focus on Diagnosis sample data set, Ms. Verkhovskaya found that 1,522 of the 2,808 wrong number phone numbers were registered at the relevant time.

Finally, Ms. Verkhovskaya proposes to process the results of the Do Not Call registration analysis using LexisNexis data to identify any possible business telephone numbers. For the 5 Focus on Diagnosis events analyzed, Ms. Verkhovskaya identified 4 phone numbers identified as business numbers in the subset of Do Not Call registered wrong numbers. Accordingly, Ms.

Verkhovskaya concluded that in the data set there were 1,518 consumers with "wrong number" residential cell phone and landline numbers that would be included in the Do Not Call Registry Class.

Ms. Verkhovskaya's expert opinions can be summarized as follows:

- It is possible, common, and administratively feasible to reliably identify the phone users on the historical dates on which calls were made by Defendant, and to compare such users against the intended call recipients to identify the "wrong numbers" that were called.

- It is possible, common, and administratively feasible to reliably identify whether phone numbers during a historical date were cell or landline numbers, and whether such phone numbers were "residential."

- It is possible, common, and administratively feasible to reliably identify telephone numbers that received two or more calls after they were on the Do Not Call registry for more than the 31-day grace period utilizing the historic date of their registry and the analysis of whether such telephone numbers were "residential."

Exhibit 12 at pg. 3.

## II.    THE TELEPHONE CONSUMER PROTECTION ACT

Robocalls and prerecorded voice calls are illegal, 47 U.S.C. § 227(b), and people hate them, but only 1 in 7,000,000 results in a federal lawsuit. *Compare* Herb Weisbaum, It's Not Just You—Americans Received 30 Billion Robocalls Last Year, NBC News (Jan. 17, 2018), https://www.nbcnews.com/business/consumer/it-s-not-just-you-americans-received-30-billion-robocalls-n838406 (30.5 billion robocalls) *with* WebRecon, WebRecon Stats for Dec 2017 & Year in Review (last visited June 21, 2019), https://webrecon.com/webrecon-stats-for-dec-2017-year-in-review/ (4,392 TCPA complaints).

In 1991, Congress enacted the TCPA to protect consumers from intrusive and unwanted calls.  *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).  It explained: "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or

prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 § 2(10). "Banning such automated or prerecorded telephone calls to the home, except when the *receiving party* consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id*. § 2(12) (emphasis added). The TCPA's sponsor described unwanted prerecorded voice and robocalls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall." 137 Cong. Rec. 30,821 (1991) (statement of Sen. Hollings).

As a remedial statute that was passed to protect consumers from unwanted automated telephone calls, the TCPA is construed broadly to benefit consumers.  *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013).  "If proposed interpretations of the TCPA are equally plausible, the scales tip in favor of the consumer."  *Klein v. Commerce Energy, Inc.*, 256 F. Supp. 3d 563, 576 (W.D. Pa. 2017).

In this case, Plaintiff Sandoe asserts two TCPA claims arising from the prerecorded voice message calls Boston Scientific erroneously made to his personal cell phone number that had been registered on the Do Not Call registry.  The first for violation of the TCPA's ban on unsolicited prerecorded voice calls, and the second for violation of the TCPA's ban on unsolicited calls to phone numbers registered on the national Do Not Call registry.

In response, Boston Scientific asserts that three of its affirmative defenses are relevant to the class certification inquiry.  *See* Boston Scientific's Answers to Interrogatories at no. 10. First, Boston Scientific argues that the calls to Plaintiff (and, by effect, other wrong number

calls) were calls related to the health care of the intended recipients of the calls – i.e., physicians'
patients – and that calls to consumers like Plaintiff Sandoe who were reassigned those
physicians' patients' phone numbers were made "in error." *Id*.  Second, Boston Scientific argues
that it had consent to make calls to physicians' patients. *Id*. And third, Boston Scientific argues
that Plaintiff Sandoe will not be able to identify wrong number call recipients. *Id*.

Boston Scientific bears the burden on each of these defenses.  And, more importantly for
purposes of this motion, as with the elements of Plaintiff's claims, each of Boston Scientific's
defenses is susceptible to resolution on a classwide basis using common proofs.

### A.  The Prerecorded Voice Calls Claim

Plaintiff's first claim is brought under 47 U.S.C. § 227(b), which prohibits a company
from making or initiating prerecorded voice calls to cell phone numbers and residential landlines.

Specifically, 47 U.S.C. § 227(b)(1)(A)(iii) makes it "unlawful" to (1) "make any call" (2)
"using … an artificial or prerecorded voice" (3) "to any telephone number assigned to a …
cellular telephone service."  For a prerecorded voice call to a cell phone number that "constitutes
telemarketing," the TCPA requires a company to obtain the "prior express written consent of the
called party" before making the call to avoid liability.  47 C.F.R. § 64.1200(a)(2); *see also* 47
C.F.R. § 64.1200(f)(12) ("The term telemarketing means the initiation of a telephone call or
message for the purpose of encouraging the purchase or rental of, or investment in, property,
goods, or services, which is transmitted to any person.").  However, if the prerecorded voice call
delivers a "health care message," even if the call otherwise constitutes telemarketing, a lower
level of consent ("prior express consent") is required.  *Id*.

The TCPA's substantively identical prohibition on prerecorded voice calls to "residential
lines," 47 U.S.C. § 227(b)(2), also requires a company to obtain the "prior express written

consent of the called party" before making a call that "constitutes telemarketing", unless the call delivers a "health care message," in which case no consent is required.  47 C.F.R. § 64.1200(a)(3).  Notably, however, as a matter of law, a call does not deliver a "health care message," if it is not made on behalf of the recipient's physician, it does not concern the health care of the recipient, and it does not concern the administration of medication prescribed to the recipient.  *Zani v. Rite Aid Headquarters Corp.*, 246 F. Supp. 3d 835, 849-52 (S.D.N.Y. 2017) ("The calls were … made within the confines of an established health care treatment relationship."); *see Bailey v. CVS Pharm., Inc.*, No. 27-cv-22482, 2018 U.S. Dist. LEXIS 137049, at *15 (D.N.J. Aug. 14, 2018) ("Here, all three factors are present … the text messages were limited only to CVS customers who enrolled or consented to the CVS Ready Text Program"); *see also In re Boston Scientific Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 280-81 (D. Mass. 2009) ("The district court's inquiry into the merits at the class certification stage should only be conducted to the extent that the merits overlap the Rule 23 criteria").

The TCPA imposes a minimum of $500 in statutory damages per violative prerecorded voice call to a cell phone number or residential line, and provides for up to $1,500 per violation if the company acted "willfully or knowingly."  47 U.S.C. § 227(b)(3); *see Echevvaria v. Diversified Consultants, Inc.*, No. 13 Civ. 4980, 2014 U.S. Dist. LEXIS 32136, at *28-37 (S.D.N.Y. Feb. 28, 2014) (finding a willful or knowing violation where the defendant "knew or should have known" that it was using an autodialer and that it was calling a wrong number).

Plaintiff's prerecorded voice calls claim is subject to classwide proof.  First, Boston Scientific does not dispute that it made prerecorded voice calls to over 265,000 consumer phone numbers.  In fact, Boston Scientific has call logs for these calls and corresponding spreadsheets that reflect, at a minimum, the phone numbers that were called and the corresponding names of

the intended recipients of those calls.  Sample call records identifying the phone number and intended recipients of prerecorded voice calls for 5 Focus on Diagnosis events, which were produced by Boston Scientific for the Plaintiff's expert's analysis, are attached as Exhibit 13.

Second, Plaintiff's expert Ms. Verkhovskaya's methodology involving, among other things, comparing a historical reverse phone number lookup for the phone numbers called with Boston Scientific's call records identifying the intended recipients of the calls provides a classwide means of determining (1) which calls were made to wrong number class members, and, (2) of those calls, which were made to cell phone numbers, residential landlines, or neither.

Third, because, as of the close of class certification discovery, there is no evidence of a relationship between any wrong number call recipients and Boston Scientific or any of the physicians Boston Scientific was calling on behalf of, whether the call delivered a health care message to wrong number call recipients is based on the common fact that no member of the class had an established health care treatment relationship relevant to the calls.  Similarly, whether the call was telemarketing will be determined based on Boston Scientific's underlying purpose in making the prerecorded voice calls, regardless of the content of any specific call or presentation at a Focus on Diagnosis event promoted by the calls.  *See Golan v. Veritas Entertainment, LLC*, 788 F.3d 814, 819-21 (8th Cir. 2015) ("the purpose of the calls is the critical issue in this case"); *Chesbro v. Best Buy Stores, LP*, 705 F.3d 913, 917-18 (9th 2012) (citing FCC order:  "[A]pplication of the prerecorded message rule should turn, not on the caller's characterization of the call, but on the purpose of the message."); *Bennett v. GoDaddy.com LLC*, No. CV-16-3908, 2019 U.S. Dist. LEXIS 59766, at *18-27 (D. Ariz. Apr. 8, 2019) ("The relevant question is Defendant's *purpose* in initiating the calls" (emphasis in original)).  Accordingly, Boston Scientific's consent defense, to be resolved after the health care

message and telemarketing questions, can be resolved on a common basis because, as of the close of class certification discovery, there is no evidence that Boston Scientific or the physicians it was calling on behalf of had prior express written consent or any lesser level of consent to make prerecorded voice calls to wrong number call recipients.

**B.  The Do Not Call Registry Claim**

Plaintiff's second claim is brought under 47 U.S.C. § 227(c), which provides a private right of action to any consumer who receives two or more "telephone solicitations" within a twelve month period to a residential line or a cell phone number used for residential purposes that was registered on the national Do Not Call registry more than 30 days before the calls.  47 C.F.R. §§ 64.1200(c)(2), (e); *see* 47 C.F.R. § 64.1200(f)(14) ("The term telephone solicitation means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person …").

As with the prerecorded voice calls claim, prior express written consent is a defense to a Do Not Call registry claim, but, unlike with the prerecorded voice calls claim, whether a call delivers a health care message does not alter the consent requirement.  *Id*. at §§ (c)(2)(i)-(iii).

The TCPA imposes up to $500 in statutory damages per violation of the Do Not Call registry provision, and provides for treble damages if the company acted "willfully or knowingly."  47 U.S.C. § 227(c)(5).  Importantly, "a person may recover statutory damages of $1500 for a willful or knowing violation of … § 227(b)(3), and $1500 for a willful or knowing violation of the do-not-call-list requirements, § 227(c)(5)—even if both violations occurred in the same telephone call."  *Charvat v. NMP, LLC*, 656 F.3d 440, 449 (6th Cir. 2011) (holding that § 227(b) and § 227(c) target different harms).

14

Here, as with Plaintiff's prerecorded voice calls claim, the Do Not Call registry claim is subject to common proof.  First, inquiry into whether the calls constitute "telephone solicitations" is identical to the inquiry into whether the calls constitute "telemarketing" and is based on Boston Scientific's purpose for making the calls.  Second, identifying wrong number call recipient class members whose phone numbers were registered on the Do Not Call registry and used for residential purposes at the time of Boston Scientific's calls will be done on a classwide basis by applying Plaintiff's expert Ms. Verkhovskaya's methodology and based on her testimony.  And third, because as of the close of class discovery there is no evidence that Boston Scientific or the physicians it called on behalf of had prior express written consent to call any wrong number call recipient, the resolution of any consent defense will be based on the general absence of such evidence.

Accordingly, and as further discussed below with reference to the specific requirements of Rule 23, class certification is appropriate for both of Plaintiff's TCPA claims.

## III.    THE CLASSES

Plaintiff Sandoe seeks certification of the following two Classes:

**Prerecorded No Consent Class**:  All persons in the United States who from four years prior to the filing of this action through the present (1) Defendant (or an agent acting on behalf of Defendant) called, (2) using a prerecorded voice message, (3) where such person was not listed in Defendant's records as the intended recipient of the call.

**Do Not Call Registry Class**:  All persons in the United States who from four years prior to the filing of this action through the present (1) Defendant (or an agent acting on behalf of Defendant) called more than one time, (2) within any 12-month period, (3) where the person's telephone number had been listed on the National Do Not Call Registry for at least thirty days, (4) to invite them to a Boston Scientific educational event, (5) where such person was not listed in Defendant's records as the intended recipient of the call.

The following individuals are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, their subsidiaries,

parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) Plaintiff's attorneys; (4) persons who properly execute and file a timely request for exclusion from the Classes; (5) the legal representatives, successors or assigns of any such excluded persons; and (6) persons whose claims against Defendant have been fully and finally adjudicated and/or released.

## IV.   RULE 23 IS SATISFIED AND THE CLASSES SHOULD BE CERTIFIED

"[T]he decision to grant or deny class certification is left to this Court's broad discretion." *Mogel v. UNUM Life Ins. Co. of Am.*, 677 F. Supp. 2d 362, 365 (D. Mass. 2009) (Gorton, J.) (citing *McCuin v. Sec'y of Health and Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987)).[4] "In light of the fact that Rule 23 provides a district judge with great flexibility to adopt appropriate procedures, certify conditionally, or decertify a class in later stages of litigation, … judges should err in favor of certification." *DeLeon-Granados v. Eller & Sons Trees, Inc.*, 497 F.3d 1214, 1218 (11th Cir. 2007).

A class should be certified if it satisfies the four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *See* Fed. R. Civ. P. 23; *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1321-22 (11th Cir. 2008). To meet Rule 23(a)'s prerequisites, Plaintiff must demonstrate that:

1) The class is so numerous that joinder is impracticable;

2) There are questions of law or fact common to the class;

3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and

4) The representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1-4).

---

[4] Internal citations omitted throughout.

Here, Plaintiff seeks certification under Rule 23(b)(3). *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011). Rule 23(b)(3) further mandates that plaintiffs demonstrate that common questions of law or fact "predominate over any questions affecting individual members" and that maintaining a class action "is superior to other available methods" of adjudication. Plaintiff's proposed class meets all of these requirements.

### A. The Proposed Classes are Ascertainable

Although not explicitly mentioned in Rule 23, an implicit prerequisite to class certification is that "the class must be 'definite,' that is, the standards must allow the class members to be ascertainable." *Pagliaroni v. Mastic Home Exteriors, Inc.*, Civil Action No. 12-10164-DJC, 2015 U.S. Dist. LEXIS 126543, at *33 (D. Mass. Sep. 21, 2015). The goal of Rule 23's implicit ascertainability requirement is not to determine the actual identities of individual class members, but to ensure that class members generally "receive the best notice practicable and have an opportunity to opt out." MAN. FOR COMPLEX LITIG. (4th ed. 2004) § 21.222 at 270. A class is ascertainable where it is defined by an "objective criterion." *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 139 (1st Cir. 2012).

Here, class members can be identified through objective criteria.  Plaintiff Sandoe intends to rely on Boston Scientific call records and Plaintiff's expert's methodology involving reverse phone number look ups.  "The use of such such objective criteria satisfies the ascertainability requirement."  *Ikuseghan v. Multicare Health Sys.*, No. C14-5539 BHS, 2015 U.S. Dist. LEXIS 99175, at *9 (W.D. Wash. July 29, 2015).

"At the class certification stage, the court must be satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members. The court may proceed with certification so long as this mechanism will be

'administratively feasible,' and protective of defendants' Seventh Amendment and due process rights." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19 (1st Cir. 2015). The First Circuit has expressly endorsed requiring affidavits from class members at the claims stage as an appropriate mechanism for identifying injured class members. *Id.*; *see Carter v. Dial Corp.*, 869 F.3d 13, 14 (1st Cir. 2017) (denying petition for immediate leave to appeal class certification order approving of class member affidavits as a means of excluding uninjured class members).

Here, such a mechanism could be easily and fairly implemented. In the first instance, based on Plaintiff's expert's methodology, potential class membership will be limited to consumers associated with the phone numbers on the dates Boston Scientific called that are not identified as the intended recipients of the calls in Boston Scientific's call records. Accordingly, a potential class member's attestation that she or he was the user or subscriber of the phone number in question on the date of Boston Scientific's calls would be sufficient to eliminate any consumers who were not the intended recipients and (1) abandoned the phone number before Boston Scientific's calls or (2) were assigned the phone number after Boston Scientific's calls. *See Reyes v. BCA Fin. Servs.*, No. 16-24077-CIV, 2018 U.S. Dist. LEXIS 106449, at *37-38 (S.D. Fla. June 26, 2018) ("In short, the Court will not strike Verkhovskaya's opinion at this time and will consider it when deciding the administrative-feasibility question. On that question, the Court agrees with Reyes that she has presented an administratively feasible method of identifying class members. Although 'B' flags or 'WN' notations may not incontrovertibly establish that BCA dialed a wrong number, and thus would not conclusively establish who is a class member, that fact does not defeat class certification because Reyes is not proposing to rely solely on BCA's records to identify class members. Rather, those notations would represent a starting point from which Reyes can further define the class through the methods described by

her expert, including the use of self-identifying affidavits and subpoenas."); *Krakauer v. Dish Network, LLC*, No. 1:14-CV-333, 2017 U.S. Dist. LEXIS 117713, at *17 (M.D.N.C. July 27, 2017) ("the Court will … require a claims administration process that gives Dish the opportunity to reasonably challenge individual claims to class membership").

"[I]f such consumer testimony would be sufficient to establish injury in an individual suit, it follows that similar testimony in the form of an affidavit or declaration would be sufficient in a class action.  There cannot be a more stringent burden of proof in class actions than in individual actions.  'Rigorous analysis' of Rule 23 requirements does not require raising the bar for plaintiffs higher than they would have to meet in individual suits." *In re Nexium Antitrust Litig.*, 777 F.3d at 20-23 ("[I]t is difficult to understand why the presence of uninjured class members at the preliminary stage should defeat class certification. Ultimately, the defendants will not pay, and the class members will not recover, amounts attributable to uninjured class members, and judgment will not be entered in favor of such members. Some number of uninjured members will receive a class notice, but the district court can easily assure that defendants will not pay for notice to uninjured members.  At worst the inclusion of some uninjured class members is inefficient, but this is counterbalanced by the overall efficiency of the class action mechanism.").

### B.  Boston Scientific Has Stipulated to Numerosity

The first requirement of Rule 23(a) is that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009).  Here, Boston Scientific admits

that it made prerecorded voice calls to over 265,000 unique phone numbers, and the parties have stipulated that the wrong number classes consisting of a subset of these calls meet the numerosity requirement. *See* Emails from Boston Scientific's counsel, attached as Exhibit 14, stipulating to numerosity.

### C. The Claims of All Class Members and the Defenses to Those Claims All Involve Common Facts and Proof

Rule 23(a)(2) next requires that there is "a common question of law or fact among the members of the class." While both common questions of law and common questions of fact exist as to the proposed class, both need not be shown to satisfy the rule. To meet the commonality requirement, the representative plaintiff is required to demonstrate that the proposed class members "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

As other courts in this District have held, "the commonality requirement is met where the "questions that go to the heart of the elements of the cause of action" will "each be answered either 'yes' or 'no' for the entire class" and "the answers will not vary by individual class member." *Garcia v. E.J. Amusements of N.H., Inc.*, 98 F. Supp. 3d 277, 285 (D. Mass. 2015) (Saris, J.) *quoting Donovan v. Philip Morris USA, Inc.*, 2012 U.S. Dist. LEXIS 37974, at *21 (D. Mass. Mar. 21, 2012). Here, the common questions are dispositive, apply equally to all class members, and can be resolved using common proof and uniform legal analysis. They include:

- Did Boston Scientific make prerecorded voice calls to consumers that were not the intended recipients of those calls?

- Did Boston Scientific make prerecorded voice calls to consumers whose phone numbers were duly registered on the national Do Not Call registry at the time of the calls?

20

- Did the calls deliver a health care message?

- Did the calls constitute telephone solicitations and telemarketing?

- Did Boston Scientific have consent to make the calls?

- Are consumers that are members of both classes entitled to damages for violations of the TCPA's prerecorded voice calls provision and Do Not Call registry provision based on the same calls?

- Were Boston Scientific's TCPA violations willful or knowing?

These legal and factual questions are shared by all class members. Moreover, should Plaintiff ultimately succeed in this action, both he and the proposed members of the Classes will be entitled to identical statutory damages to be calculated on a per violation basis.

### D.  Plaintiff and All Class Members Received the Substantively the Same Solicitations and Share the Same TCPA Claims

Generally, typicality is satisfied where the claims are based on the same legal remedial theory. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997). "The central inquiry in determining whether a proposed class has 'typicality' is whether the class representative's claims have the same essential characteristics as the claims of the other members of the class." *Garcia v. E.J. Amusements of N.H., Inc.*, 98 F. Supp. 3d 277, 288 (D. Mass. 2015). Yet, the "[c]lass members' claims need not be identical to satisfy the typicality requirement; rather, there need only exist 'a sufficient nexus between the legal claims of the named class representatives and those of individual class members to warrant class certification.'" *Ault v. Walt Disney World Co.,* 692 F.3d 1212, 1216 (11th Cir. 2012).  The required nexus exists "if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *See Ault,* 692 F.3d at 1216.  Typicality is satisfied in TCPA cases where the claims are based on the defendant's homogenous telemarketing. *E.g.*, *Whitaker v.*

*Bennett Law, PLLC*, No. 13-cv-3145-L(NLS), 2014 U.S. Dist. LEXIS 152099, at *13 (S.D. Cal. Oct. 27, 2014) (finding typicality satisfied because each class member's claim "revolves exclusively around [the defendant's] conduct as it specifically relates to the alleged violations of the TCPA"); *Agne v. Papa John's Int'l*, 286 F.R.D. 559, 569 (W.D. Wash. 2012) (finding typicality satisfied where the plaintiff's claims, "like all class members' claims, arise from text marketing campaigns . . . executed by the same marketing vendor").

Here, Boston Scientific's calls were part of a unified calling campaign to promote Focus on Diagnosis events. Boston Scientific collected and failed to verify or confirm call recipients' phone numbers in the same way, and then made substantively identical calls to them promoting substantively identical educational events. Because the classes are limited to recipients of Boston Scientific calls who, like Plaintiff Sandoe, were not the intended recipients of the calls, the classes' claims arise from the same legal theory.

### E.  Plaintiff and His Counsel Have Demonstrated the Commitment and Competency Needed to Prosecute the Class Claims

Rule 23(a)(4) requires that the class representative can fairly and adequately protect and represent the interests of each member of the class. "[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem* at 625-26 (1997). Rule 23(a)(4) "requires courts to ask whether plaintiff's interests are antagonistic to the interest of other members of the class." *Id*; *see also In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 315 F.R.D. 116, 123 (D. Mass. 2016) (Gorton, J.) (finding a plaintiff that had a basic understanding of the litigation and exhibited an interest in pursuing the suit adequate).

Plaintiff has no conflicting interests with class members. In fact, by investigating, filing, and vigorously prosecuting this case, he has demonstrated a desire and ability to protect class members' interests.

22

Just as Plaintiff is committed to the prosecution of this case, so too are his lawyers, who request appointment as class counsel.  Plaintiff's counsel has extensive experience in the area of consumer rights and class action litigation.  Plaintiff's counsel has litigated multiple cases nationally (in several federal district courts) and has the resources necessary to conduct litigation of this nature. Plaintiff's counsel has been appointed as lead class counsel in several TCPA cases.  Plaintiff's counsel has dedicated substantial time and financial resources to the investigation and prosecution of the claims at issue, and will continue to do so.  A declaration of Plaintiff's Counsel in support of their class qualifications is attached at Exhibit 15.

     **F.**   **Rule 23(b)(3) Is Satisfied**

        **1.**   **Common Issues Predominate**

Predominance is "readily met" in certain consumer cases. *Amchem*, 521 U.S. at 625. As the Supreme Court has held, while Rule 23(b)(3) requires a showing that questions common to the class predominate, it does not require proof that those questions will be answered, on the merits, in favor of the class. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 133 S. Ct. 1184, 1191 (2013). "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" *Id.* TCPA claims, by their nature, involve large numbers of plaintiffs who received identical telemarketing contacts, a small number of defendants, and a common course of conduct that affected each plaintiff in the same way. Furthermore, as discussed above in connection with the commonality requirement under Rule 23(a)(2), Plaintiff has identified at least seven common issues that arise from Boston Scientific's common course of conduct and are suitable for class adjudication, each of which is subject to classwide proof.  *See* §§ 3A & 3B, above.

Courts have regularly found predominance satisfied in circumstances such as this.  For example, in *West v. Cal. Servs. Bureau*, 323 F.R.D. 295 (N.D. Cal. 2017), the plaintiffs moved to certify a wrong number class and the defendant argued that individualized inquiries into consent defeated predominance.  To resolve the consent defense using classwide proof, the plaintiffs proposed to identify class members using the methodology proposed by their expert, involving reverse phone number look ups and comparing the results of the reverse phone number look ups with the names of the intended recipients of those calls reflected in the defendant's records to identify wrong number class members who, by definition, had not consented to the defendant's calls.  *West*, 323 F.R.D. 302.  The court granted class certification, finding that the results of the expert's analysis "can be compared to defendant's call log databases to determine on a classwide basis whether consent was given with respect to each class member."  *Id.*; *accord Lavigne v. First Cmty. Bancshares, Inc.*, No. 1:15-cv-00934-WJ/LF, 2018 U.S. Dist. LEXIS 94055, at *17 (D.N.M. June 5, 2018) ("Plaintiff's proposed methodology eliminates individualized inquiries or mini-trials").

The circumstances here are substantively similar, as Plaintiff's expert's proposed methodology eliminates the need for individualized inquiries to identify wrong number class members who by definition did not consent.  The Court should therefore find that common issues predominate.

### 2.   A Class Action is the Superior Method of Adjudicating the Claims

The second prong of the analysis under Rule 23(b)(3) requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The TCPA, its allocation of statutory damages in an amount not to exceed $1,500 and its lack of a mechanism to award attorneys' fees, effectively

24

means that it is not economically viable for class members to pursue claims against the

defendants on an individual basis. This consideration is particularly compelling here. As the

United States Supreme Court has stated:

> The policy at the very core of the class action mechanism is to overcome the
> problem that small recoveries do not provide the incentive for any individual
> action to bring a solo action prosecuting his or her rights. A class action solves
> this problem by aggregating the relatively paltry potential recoveries into
> something worth someone's (usually an attorney's) labor.

*Amchem Prods.,* 521 U.S. at 609. Unsurprisingly, courts routinely find class actions to be the

superior method of adjudicating claims in the TCPA context. Indeed, the Massachusetts Court of

Appeals has stated "'the majority of courts to have discussed the issue under various cognate

class action provisions and hold that the class action mechanism is a superior avenue for

adjudication of claims under 47 U.S.C. § 227.'" *Sparkle Hill, Inc. v. Invecor, LLC*, No. 13-4172

(NLH/AMD), 2014 U.S. Dist. LEXIS 134698, at *13 n.6 (D.N.J. Sep. 23, 2014) (citing *Hazel's

Cup & Saucer, LLC v. Around The Globe Travel, Inc.,* 15 N.E. 3d 220 (Mass. App. Ct. Aug. 22,

2014)). Just like other federal courts have determined with respect to TCPA cases, a single

litigation of thousands of telemarketing calls at issue is superior to a series of other litigations or

to individuals potentially foregoing their claims.

### V.    PLAINTIFF'S EXPERT'S TESTIMONY IS ADMISSIBLE

"When an expert's report is critical to class certification, a court must perform a full

*Daubert* analysis …." *Krakauer v. Dish Network, L.L.C.*, No. 1:14-CV-333, 2015 U.S. Dist.

LEXIS 118858, at *12 (M.D.N.C. Sep. 8, 2015) ("Whether expert evidence is reliable is

primarily a question of the validity of the expert's methodology, not the quality of the data used

or the conclusions produced.").  "The admissibility of expert testimony is governed by Fed. R.

Evid. 702." *Ting Ji v. Bose Corp.*, 538 F. Supp. 2d 354, 357-58 (D. Mass. 2008) (Gorton, J.).

"The Court's role is to determine whether the expert possesses some specialized knowledge such

that his or her testimony will be helpful to the trier of fact and, if so, whether that knowledge arises from reliable methods applied in a reliable manner." *Id*. "This knowledge need not be scientific or technical." *Id*. "In non-technical areas, long experience in a field can confer expertise upon a witness." *Id*.

"The Court must nonetheless keep in mind that vigorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and more appropriate means of attacking shaky but admissible evidence." *Koninklijke Philips N.V. v. Zoll Med. Corp.*, 256 F. Supp. 3d 50, 52 (D. Mass. 2017) (Gorton, J.). "If an expert's testimony is within 'the range where experts might reasonably differ,' the jury, not the trial court, should be the one to decide among the conflicting views of different experts." *Id*.

"[A]rguments about the speculative nature of and lack of support for [an expert's] testimony amount to disagreements with his conclusions." *Provanzano v. MTD Prods. Co.*, Civil Action No. 15-11720-NMG, 2016 U.S. Dist. LEXIS 143402, at *4-5 (D. Mass. Oct. 17, 2016) (Gorton, J.). "Such disagreements are not, however, proper grounds for exclusion." *Id.* "Furthermore, failure to consider particular variables or to use certain methods is not fatal to an expert's testimony." *Id*. These types of objection "[go] to the weight, not the admissibility, of the testimony." *Id*.; *cf. Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos*., 853 F. Supp. 2d 181, 191 (D. Mass. 2012) ("Given, however, the pervasiveness of Dr. Hakala's methodological errors and the lack of congruity between his theory and the data, the Court is compelled to exercise its role as gatekeeper and to exclude his event study as unreliable.").

Here, Ms. Verkhovskaya has specialized knowledge and applied her methodology to the facts in a consistent and reliable way to reach her conclusions.  Verkhovskaya Report at ¶¶ 31-

70.  In fact, courts regularly rely on Plaintiff's expert's proposed methodology, involving reverse phone number lookups based on the defendant's call records and third-party data, to identify wrong number class members in TCPA class actions.  In fact, a Florida district court recently approved of such a methodology to identify wrong number class members in connection with a class action settlement involving a defendant represented by Boston Scientific's counsel in this action.  *See Williams v. Bluestem Brands, Inc.*, No. 17-cv-1971, 2019 U.S. Dist. LEXIS 56655 (M.D. Fla. Apr. 2, 2019).

As a result, district courts have regularly admitted substantively similar testimony as Plaintiff's expert Ms. Verkhovskaya proffers here under *Daubert*.  *E.g., Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.*, No. 15-CV-6314-YGR, 2017 U.S. Dist. LEXIS 69307, at *11-12 (N.D. Cal. May 5, 2017) ("Finally, the Court finds that defendants' objection to Ms. Verkhovskaya's use of Lexis Nexis data to remove business numbers from her output list relates to the weight of her opinion, not exclusion. Another court rejected a similar challenge to her methodology in Krakauer, finding that Ms. Verkhovskaya properly used Lexis Nexis data to remove business numbers from her output list because it was the type of data reasonably relied upon by experts in the field and the 14% error rate was not 'unreasonably high for these particular circumstances.'"); *Krakauer v. Dish Network L.L.C.*, No. 1:14-CV-333, 2017 U.S. Dist. LEXIS 86448, at *13-16 (M.D.N.C. June 6, 2017) (Ms. Verkhovskaya "testified that her analysis of the call data was based on her experience in the data industry and her understanding of the practices of several data vendors on whose data she regularly relies. … She obtained information about what numbers were on the Registry from Nexxa, which she testified was an 'industry standard.' … She also used the LexisNexis database to remove additional business and government numbers from the class. … To the extent there was conflicting evidence that

27

questioned the validity, credibility, and weight of Ms. Verkhovskaya's opinions, the jury weighed that evidence and rejected Dish's evidence.").

The Court should therefore rely on Ms. Verkhovskaya's testimony to conclude that Plaintiff's proposed classes should be certified.

## VI.    <u>CONCLUSION</u>

Having established that all elements of certification under Rule 23(b)(3) are satisfied for the reasons detailed above, Plaintiff Sandoe respectfully requests that this Court grant class certification; appoint him as representative of the Class; appoint Kaufman P.A. and Law Offices of Stefan Coleman P.A. as class counsel; and establish a deadline for submission of a proposed class notice and notice plan.

Dated: June 21, 2019

/s/ Jason Campbell
Jason Campbell Esq.
250 First Avenue, Unit 602
Charlestown, MA 02129
(617) 872-8652
jasonrcampbell@ymail.com

Avi R. Kaufman
kaufman@kaufmanpa.com
Kaufman P.A.
400 NW 26th Street
Miami, FL 33127
Telephone: (305) 469-5881

Stefan Coleman
law@stefancoleman.com
LAW OFFICES OF STEFAN COLEMAN, P.A.
201 S. Biscayne Blvd, 28th Floor
Miami, Fl 33131
Telephone: (877) 333-9427
Facsimile: (888) 498-8946

*Attorneys for Plaintiff and the putative Classes*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 21, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and it is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

*/s/ Jason Campbell*